# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-00579-SCT

## CONSOLIDATED WITH

## NO. 1999-CA-01725-SCT

|  |
| --- |
| *DELAINE STACY AND SANDY R. STACY* |
| *v.* |
| *WILLIARD KENNETH ROSS AND SUE M. ROSS* |

| | |
| --- | --- |
| DATE OF JUDGMENT: | 02/18/1999 |
| TRIAL JUDGE: | HON. JOHN C. ROSS, JR. |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | WALTER E. WOOD |
| ATTORNEY FOR APPELLEES: | PHIL R. HINTON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART AND REMANDED - 10/31/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/21/2001 |

**EN BANC.**

**BANKS, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Here we are faced with a question concerning grandparent visitation where there is a dispute between the natural parents whose marriage is intact and who have custody, and the maternal grandparents. We conclude that the trial court applied an erroneous standard in deciding the issue. We reverse the judgment and render as to visitation, affirm as to contempt and remand for determination of attorney's fees to the parents.

## I.

¶2. On October 29, 1997, William Kenneth Ross and Sue Ross ("Grandparents"), the natural parents of Sandy Stacy, brought action in Alcorn County Chancery Court for grandparent visitation with Kevin Stacy, age 7 and the natural child of Delaine Stacy and Sandy Stacy ("Parents"). The chancery court granted visitation rights to the grandparents after finding there was a "deteriorated relationship" between the

grandparents and the parents.

¶3. Kenneth Ross, Kevin's grandfather, suffered several medical problems after being severely burned in 1962. He spent a total of 105 days in the hospital and within two years after returning to work, twice underwent surgery for ruptured disks and also underwent a heart bypass surgery. After Kenneth began drawing his social security disability, he stayed at home taking care of the house, a small farm and horses that he kept there.

¶4. The Rosses' daughter, Sandy, was married to Delaine Stacy and living with him in Jackson, Mississippi, at the time that their son Kevin was born. When Kevin was approximately six weeks old, the Stacys moved to her parents' farm and built a home on approximately two acres of land given them by Sue and Kenneth. From then, until Kevin was six years of age, the Stacys lived next door to the Rosses. The remaining facts are in dispute.

¶5. Sandy described having only a limited relationship with her parents, leaving home at the age of 16 due to many years of great conflicts. Her parents, she said, insisted that she and her husband build a house on their property and though concerned that the arrangement would lead to trouble in the future, as she knew her parents to be forceful, controlling, and extremely dominating when she was a child, Sandy agreed.

¶6. From 1992 until 1997, the Stacys lived close to the Rosses, and Kevin spent a good deal of time with his grandparents, especially with his grandfather Kenneth. Over the years, the Rosses helped provide for Kevin, buying him clothes and toys. Several times a week, Kenneth says he picked up Kevin from kindergarten and when his parents were out of town, they would keep Kevin. The Rosses argue they put $3,500.00 in a savings account for Kevin in the names of Sandy and Delaine, but the Stacys deny there was any savings account.

¶7. It is unnecessary to discuss the different versions of the details of the deteriorated relationship between the parents and the grandparents. It should suffice to say that the deterioration resulted in at least one physical altercation. The altercation resulted in charges and counter charges of assault which were later dropped. Eventually, the parents denied the grandparents access to the child, and this action ensued.

¶8. On September 2, 1998, after a hearing on the matter, the court entered an interim order finding the conflict so severe that it placed the child in the middle. It also found that the grandparents had established a viable relationship with Kevin pursuant to the "appropriate statutes" and that the primary goal was to reestablish visitation with the grandparents. Because it determined the relationship between the Rosses and the Stacys had deteriorated, however, and the conflict was so severe that it placed the minor child in the middle, such was not possible without remedial steps.

¶9. In the first of three judgments addressing visitation, the court ordered all parties to participate in a court-established counseling program with a court-appointed counselor. In an order dated December 21 and filed on January 11, 1999, the court ordered the parties to cease all conflicts from past disagreements and the Stacys to make Kevin available for visitation with the Rosses, under the supervision of the counselor. The court held all other matters in abeyance and provided for further reports and review at any time prior to March 5, 1999. It did not find visitation was in Kevin's best interest nor did it find that the Stacys had unreasonably withheld visitation.

¶10. On February 23, 1999, the court entered a new judgment setting out unsupervised visitation for the

Rosses. This judgment did not indicate that further action of the court was contemplated. On March 24, 1999, the Stacys filed a notice of appeal from that judgment.

¶11. In the meantime, however, the Stacys did not abide by the court's unsupervised judgment and the Rosses moved to enforce the visitation schedule, complaining of the Stacys' presence during visitations with Kevin. The Stacys moved for relief under Miss. R. Civ. P. 60 complaining that full compliance was not possible due to Sandy Stacy's high-risk pregnancy and asserting further that the judgment was void because the chancellor had not found that grandparent visitation was in Kevin's best interest.

¶12. On June 23,1999, the chancellor entered judgment denying the Stacys' motion and held them in contempt of court. The chancellor further found the Stacys were unreasonably denying visitation to the Rosses with Kevin, but made no finding that visitation with the Rosses was in Kevin's best interest. On June 23, 1999, the Rosses moved for contempt against the Stacys, asserting they were again denied visitation scheduled for June 19-21, 1999. The Stacys responded that they had not received an executed judgment from which the contempt was alleged until July 7, 1999,[1] after the visitation was to occur. They filed a motion to stay and charged that the Grandparents Visitation Rights Act, Miss. Code Ann. §§ 93-16-1 to -7 (1994), was unconstitutional. The court heard testimony on the matter and rendered judgment against the Stacys finding them in contempt and denying them the requested relief on September 17, 1999. From that judgment, the Stacys file a second appeal which has been consolidated with the first.

## II.

¶13. A limited standard of review is employed by this Court in reviewing decisions of a chancellor. ***Reddell v. Reddell***, 696 So. 2d 287, 288 (Miss. 1997). Findings will not be disturbed on review unless the chancellor abused his discretion, was manifestly wrong, or made a finding which was clearly erroneous. ***Bank of Miss. v. Hollingsworth***, 609 So. 2d 42, 424 (Miss. 1992). The Court reviews questions of law, however, under a de novo standard. ***Zeman v. Stanford***, 789 So. 2d 798, 802 (Miss. 2001).

## III.

¶14. The Rosses assert that the Stacys are procedurally barred from raising the constitutionality of our grandparents visitation law. We pretermit discussion of the procedural bar and address the statute with a view toward construing it in a manner which comports with its intent and the Constitution. We also reject the Rosses' contention that the merits of the determination that visitation should be ordered is not properly before the Court. Their contention is that the Stacys should have appealed from the September 2, 1998, order. That order however was clearly an interim order in both style and content. The order entered on January 11, 1999, while styled as a "judgment of the court" was likewise interim in nature. This Court has jurisdiction of the merits of the visitation decision.

### a.

¶15. The Stacys argue the Mississippi Grandparents' Visitation Act is unconstitutional as written because it allows the trial court "to disregard and overturn any decision by a fit custodial parent concerning visitation whenever a third party affected by the decision filed a visitation petition, based solely on the judge's determination of the child's best interest in violation of the Fourteenth Amendment's Due Process Clause," citing ***Troxel v. Granville***, 530 U.S. 57, 120 S. Ct. 2054, 2056, 147 L.Ed. 2d 49 (2000). We disagree.

¶16. In ***Troxel*** the U.S. Supreme Court held that Washington Rev. Code, § 26.10.160 (3) was

unconstitutional because it permitted "any person" to petition for visitation rights "at any time" and authorizes state superior courts to grant such rights whenever visitation may serve a child's best interest. The Washington statute formerly read in relevant part:

> The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.

> Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings.

Washington Rev. Code § 26.10.160 (3).

¶17. Unlike the " breathtakingly broad" "any person" language in Washington's statute, as characterized by Justice O'Connor writing for the majority in *Troxel*, 120 S. Ct. at 2061, Mississippi Grandparents' Visitation Act expressly permits state courts to grant visitation to grandparents. But before doing so, the court must find that (1) the grandparent has established a viable relationship with the grandchild, (2) that the custodial parents have unreasonably denied grandparent visitation, and (3) visitation between the grandparent and the grandchild would be in the best interest of the child. Miss. Code Ann. § 93-16-1(2). The Washington statute did not enumerate the same or even similar limitations and, significantly, the Supreme Court distinguished Mississippi as being among those states which expressly provide limitations (that Mississippi courts may not award visitation unless a parent has unreasonably denied visitation). *Troxel*, 120 S. Ct. at 2062. *See also* **Zeman v. Stanford,** 789 So. 2d at 803 (the limitations imposed by this Court in its interpretation of § 93-16-3 clearly result in the "narrower reading" lacking in *Troxel*). The Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions as to care, custody, and control of their children. *Troxel*, 120 S. Ct. at 2060. This right, however, is not absolute. *Id.* As the Stacys have asserted no other grounds for unconstitutionality with regard to the issue, their assertion is without merit.

### b.

¶18. The constitutionality of any standard for awarding visitation "turns on the specific manner in which that standard is *applied*." *Troxel*, 120 S. Ct. at 2064 (emphasis added). As a strong presumption exists that fit parents act in the best interests of their children, the fact that there was no allegation and no judicial finding that the parents were unfit, was of great concern to the *Troxel* Court. *Id.* at 2061. No such finding has been made here either.

¶19. The *Troxel* Court said "as long as a parent adequately cares for his or her child, (i.e., is fit) there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* Whether it is beneficial to a child to have a relationship with a grandparent in any specific case, therefore, in the first instance is a decision for the parent to make, and when it becomes subject to judicial review, "the court must accord at least some special weight to the parent's own determination." *Id.* at 2062.

¶20. In the case at hand, the Rosses have not alleged that the Stacys are unfit parents. Although the chancellor, in a subsequent judgment, commented that he had implicitly found the Stacys "unreasonably denied visitation," the Stacys have stipulated from the beginning that the Rosses have a "viable relationship" with Kevin and that they did not intend to permanently deny visitation with him. The Stacys argue, therefore,

that as in *Troxel*, the chancellor's application of the statute overruled their decision as to what would be the *appropriate visitation* with the Rosses, giving no special weight to their determination as parents of what is in their child's best interest.

¶21. In reviewing his award of visitation, the Supreme Court in *Troxel* focused on the judge's comments:

> The burden is to show that it is in the best interest of the children to have some visitation and some quality time with their grandparents. I think in most situations a commonsensical approach [is that] it is normally in the best interest of the children to spend quality time with the grandparent, unless the grandparent, [sic] there are some issues or problems involved wherein the grandparents, their lifestyles are going to impact adversely upon the children. That certainly isn't the case here from what I can tell.

*Id.* at 2062.

¶22. Likewise, the Stacys point to the chancellor's September *interim order*, where he stated:

> The grandparents have established a viable relationship with the minor child pursuant to the appropriate statutes, and the Court finds that the primary goal is to re-establish visitation rights in the part of Kenneth and Sue Ross with the minor child.

Both the trial court's findings, they argue, show the presumption exercised by the trial court was in favor of the grandparents, in violation of their Fourteenth Amendment Due Process right and infringes their fundamental right as fit parents to make decisions concerning the care, custody, and control of their child.

¶23. We view our statute as requiring no less than the Fourteenth Amendment in this regard. The determination whether parents are unreasonable in denying visitation in whole or part to grandparents is not a contest between equals. Parents with custody have a paramount right to control the environment, physical, social, and emotional, to which their children are exposed. *See Plaxico v. Michael*, 735 So. 2d 1036 (Miss. 1999); *McKee v. Flynt*, 630 So. 2d 44 (Miss. 1993); *Carter v. Taylor*, 611 So. 2d 874 (Miss. 1992); *Ethredge v. Yawn*, 605 So. 2d 761 (Miss. 1992); *White v. Thompson*, 569 So. 2d 1181 (Miss. 1990); *Simpson v. Rast*, 258 So. 2d 233 (Miss. 1972); *In re Faust*, 239 Miss. 299, 123 So. 2d 218 (1960). Interference with that right based upon anything less than compelling circumstances is not the intent of the visitation statute. Clearly, forced, extensive unsupervised visitation cannot be ordered absent compelling circumstances which suggest something near unfitness of the custodial parents.

### c.

¶24. Here, the trial court showed little regard for the wishes of admittedly fit parents. In its interim September judgment, the court simply decided that a viable relationship existed, which the parents had already stipulated to, and asserted a "the primary goal" to re-establish visitation. In a subsequent judgment, dated January 11, 1999, the court ordered visitation under the supervision and at the office of a court-appointed clinical psychologist, where Kevin would visit with his grandmother for three days in January,[2] and then with both grandparents, for two days in February. The record reflects the Stacys complied.

¶25. Then, in a third judgment, a little over a month later, on February 23, 1999, the court set a new visitation schedule asserted to be based upon the psychologist's recommendation but which does not comport with any such recommendation of record.[3] In that order Kevin would visit with his grandparents

for one Saturday a month, but now unsupervised by the counselor and without the Stacys present. Locations would alternate between Alcorn County where the Rosses lived and Hinds County where the Stacys currently lived, and Kevin would be "exchanged" at the respective county sheriff offices.

¶26. The Stacys objected to this visitation schedule and only partially complied, allowing one visitation with Sue Ross, and one visitation with both Kenneth and Sue.[(4)] In its June 21, 1999, judgment, the court held them in contempt for their failure to comply with the visitation schedule for March, April, and May, finding the Stacys "imposed their presence" at visitations and "interfered with meaningful visitation by the Rosses." The chancellor's judgment states that the supervised visitations were "*against the wishes* of Kenneth and Sue Ross," and that the others was not permitted.

¶27. The chancellor never made an express finding that visitation was in Kevin's best interest as required by Miss. Code Ann. § 93-16-3(2), much less a finding that overnight and unsupervised visitation was in his best interest. Until the June 15th judgment, in fact, the only Miss. Code Ann. § 93-16-3(2) finding made by the chancellor was that the Rosses had established a "viable relationship" which the Stacys stipulated to at the beginning.

¶28. It was months later when denying the Stacys' motion for relief where it indicated that they were "unreasonably denying visitation" was implicit in its earlier judgments. Such an implicit finding, however, must be based upon evidence. The plain fact of the matter is that the Stacys live in Hinds County and the Rosses live 200 miles away in Alcorn County. Regardless of fault, there is conflict and tension between the families. Yet, the Stacys have been willing to accord some visitation. The court referred the families to mental health professionals. At the time of the court's order making the "implicit" finding, each mental health professional had opined that visitation was not in the best interest of the child, and neither had suggested that the Stacys' position with regard to visitation was "unreasonable."

¶29. There is no finding of subsidiary facts concerning the disputes between the parties upon which to base a finding of unreasonableness. The record simply does not permit a finding of unreasonableness by the Stacys to justify the order imposed upon the Stacys. It certainly does not support the later February 23 order compelling them to travel several hundred miles to accord visitation.

¶30. Accordingly, and with an interest in judicial economy and conservation of the resources of the parties, we reverse the judgment of the chancellor and render judgment for the Stacys on the issue of visitation.

## IV.

¶31. In a judgment dated June 15, 1999, the court held the Stacys in contempt for failing to abide by the unsupervised visitation schedule for March, April, and May 1999, as had been previously ordered in the chancellor's February 23 judgment. Two of the visitations were supervised against the wishes of Kenneth and Sue Ross, and the other was not permitted. Delaine and Sandy Stacy were ordered to each pay $100.00 for Kenneth's and Sue's missed visitations. It further ordered that the Stacys would be given an opportunity to purge themselves of contempt by future compliance with the court's February visitation order and ordered that visitation missed by the Rosses in May would be made up in the June 19th-20th visitation by extending it for an extra day.

¶32. The Stacys, however, apparently did not comply. The judgment, signed on June 15 was not entered by the clerk until June 21, the last day of the June visitation. The Stacys, essentially, claim they had no

notice of the visitation, as they did not receive an executed judgment until faxed a copy on July 7, as requested, nor were they served a copy of the judgment as required by Miss. R. Civ. P. 5.[(5)] Moreover, judgments are not effective until entered in Miss. R. Civ. P. 79(a),[(6)] and the Stacys argue the judgment for which they were held in contempt was not effective because it was entered on the last day. *See* Miss. R. Civ. P. 58.

¶33. They further submit that if the judgment of the court upon which the contempt citation is based is overturned, as they urge this Court to do here, then the contempt citation is overturned, citing ***Gadson v. Gadson***, 434 So. 2d 1345 (Miss. 1983). In ***Gadson***, a husband appealed from a decree adjudging him in contempt of court for failure to perform the provisions of a divorce decree requiring him to pay alimony and child support to his wife. This Court reversed the divorce decree and remanded it to the lower court for a trial on the merits because the decree was entered without prior notice to the husband or his attorney.

¶34. The ***Gadson*** result, however, is more properly explained by the opinion specially concurring in its judgment, 434 So. 2d at 1347-51 (Robertson, J., specially concurring), with which we have expressed approval. *See **Smith v. Smith***, 545 So.2d 725, 728 (Miss. 1989). In short, unless we can say that a judgment was void ab initio, one bound by it must either comply or gain relief from an appropriate court on the pain of contempt.

¶35. This Court has reversed a judgment of contempt "where it appears that it is or was impossible to comply with the order without fault on the part of the one charged, there is no contempt." ***Keppner v. Gulf Shores, Inc.,*** 462 So.2d 719, 726 (Miss. 1985) (Hotel manager was not in contempt of court where it was impossible for him to have brought hotel within terms of injunction permanently enjoining him from discharging sewage from inn into sewage lift station because he had no authority to restrict the flow.). *See also **In re I.G.,*** 467 So. 2d 920 (Miss. 1985) (Citation for contempt entered against child's mother and stepfather was subject to reversal on ground that it was based upon educational neglect proceeding in which mother and stepfather were denied statutory due process because they were not informed of their right to assistance of counsel or the right to remain silent.); ***Hansbrough v. State ex rel. Pittman***, 193 Miss. 461, 10 So.2d 170, 171 (1942) (It is an essential element to a contempt that the party charged shall have been able to comply with the order).

¶36. The Stacys do not contend they were unable to comply with the June visitation and as the Rosses argue, the record reflects the chancellor originally ordered the June visitation on February 23. The judgment "entered" on June 21 simply expanded the scheduled weekend visitation by twenty-four hours. Thus, even if one assumes that the Stacys were not yet bound by the judgment entered on June 21, 1999, that does not relieve them of obedience to the earlier order for visitation, which was properly executed and properly served.

¶37. That portion of the court's judgment which finalizes contempt based upon prior visitations must be affirmed.

## V.

¶38. The Stacys seek attorney's fees pursuant to the provisions of Miss. Code Ann. § 93-16-3(4). They are entitled to the same. This matter is remanded to the chancery court for the determination and assessment of such fees.

# VI.

¶39. The chancellor manifestly erred in awarding the Rosses unsupervised and overnight visitation. We reverse and render as to visitation, affirm as to contempt for failure to comply with the court's orders, and remand for determination of attorney's fees for the Stacys.

¶40. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART AND REMANDED.**

> **PITTMAN, C.J., McRAE, P.J., SMITH AND DIAZ, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, J. MILLS, J., NOT PARTICIPATING.**

> **COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶41. I agree with the majority with regard to all but one issue. I would remand, rather than render, the matter of visitation. It has been more than 2 years since the chancellor last heard testimony regarding the facts and circumstances surrounding this family's battle regarding rights of visitation with Kevin Stacy, who was only 7 years old when his Grandparents first began their action. Because we know only what is in the record before us, we have no way of knowing what is in Kevin's best interest at the present time. Because so much time has passed since the final judgment, the chancellor, on remand, should consider the visitation issue, consistent with the criteria set forth by the majority, and in light of the parties' present circumstances. *See McKee v. Flynt*, 630 So. 2d 44 (Miss. 1993). Concern for judicial economy and conservation of the resources of the parties is a worthy concern, but it should not lead us to potentially unwise decisions. Also, that concern is diminished due to the fact that we are remanding on the issue of attorney's fees.

> **WALLER, J., JOINS THIS OPINION.**

1. The judgment was dated June 15, 1999, but was modified and executed on June 21, 1999, the last day of the scheduled visitation. The Stacys counterclaimed in response to the motion for contempt stating that they had not received an executed judgment, from which the contempt was alleged, until they requested it on July 7, 1999; that it was not entered until June 21, 1999; that the judgment was not effective until entered under Miss. R. Civ. P. 79; that the judgment had never been served upon them as required by Miss. R. Civ. P. 5; and that the motion for citation for contempt and to enforce judgment was filed within the ten (10) day stay of entry under Miss. R. Civ. P. 62 (a).

2. The court ordered that Kenneth Ross was not to be present at these visits under any circumstances. Dr. Masur also recommended, and the parties agreed, to expedite phasing in the visitation of Mr. Ross.

3. Based on his interview with Kevin, Dr. Fleming, the first court-appointed psychiatrist assigned to the case, wrote:

> It appears that Kevin does have some fear of his grandfather, especially, and at this time he does not want to see him. He does appear traumatized by the event of October, 1997, and today's action, if true, of his grandfather pointing a gun at his mother as he met her on the road does not help the situation. Under the circumstances, it seems appropriate that this child should not be forced to be in a situation where such events could happen again with his grandparents.

Consequently, in its interim order granting visitation, the chancellor appointed psychologist Dr. Masur to supervise visitations between the Rosses and Kevin with the Stacys present. Dr. Masur, also recognizing the continuing conflict between the Rosses and the Stacys, made the following observations in a report dated December 17, 1998:

Mr. Stacy had agreed that although Ms. Ross would begin visiting that at some future point visitation with both of the grandparents could resume. I have made the following conclusions about this case: 1. The families continue to be at war with much animosity, and vindictiveness on the part of all. 2. In my opinion it *would not be in the best interest of the child*, Kevin to be visited by Mr. and Mrs. Ross as long as the Ross' have any motivation to gain retribution, attempt to control, or any way denigrate or negate the parental authority of the Stacys in implicit or explicit ways. For example, *I do not believe that visitation is in the best interest of the child* as long as the Ross' continue to have extremely negative feelings for either parent of the child. Consistent with my conclusion here, I believe that all would be best served by complying with the Stacys latest request of the Ross' exclusive of the monetary request, about which I believe I should have no role. 3. I believe that any visitation with Kevin should be initially supervised quite closely as the Stacys have some fears that Kevin might have traumatic reaction to these visits. I certainly believe that we should be [d]iligent of this but in a cautious way as their expectations about such visitations are probably the most powerful variable controlling any traumatic reaction which might occur. I must acknowledge that I have not examined the child in any way directly but have reviewed the medical record in or file at the mental health center and have casually reviewed the testimony.

*I believe that a case could be made that it would be in the best interest of the child, Kevin, to visit with to visit with the grandparents only with the approval of and at the pleasure of the Stacys.*

(italics supplied).

4. Sandra Stacy submitted a letter to the court in March detailing their reasons for non-compliance and requesting the court reconsider.

5. Rule 5 provides in part:

(a) Service: When Required. Except as otherwise provided in these rules, every order required by its terms to be served, every pleading subsequent to the original complaint unless the court otherwise orders because of numerous defendants, every paper relating to discovery required to be served upon a party unless the court otherwise orders, every written motion other than one which may be heard ex parte, and every written notice, appearance, demand, offer of judgment, designation of record on appeal and similar paper shall be served upon each of the parties. No service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them in the manner provided in Rule 4 for service of summons.

6. Miss. R. Civ. P. 58 provides: "Every judgment shall be set forth on a separate document which bears the title of Judgment. A judgment shall be effective only when so set forth and when entered as provided in M.R.C.P. 79(a)."